IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| JOLINDO A. CARRARA, JR., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Civil Action No. 06-227 |
| | ) |
| MICHAEL J. ASTRUE, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

## I.    INTRODUCTION

Pending before the Court are cross-motions for summary
judgment filed by Plaintiff Jolindo A. Carrara, Jr., and Defendant
Michael J. Astrue,¹ Commissioner of Social Security.  Plaintiff
seeks review of final decisions by the Commissioner denying his
claims for disability insurance benefits ("DIB") under Title II of
the Social Security Act, 42 U.S.C. §§ 401 *et seq.*, and supplemental
security income benefits ("SSI") under Title XVI of the Social
Security Act, 42 U.S.C. §§ 1381 *et seq.*²  Defendant's motion is

---

¹ Pursuant to Fed. R. Civ. P. 23(d)(1), Michael J. Astrue, who
became Commissioner of Social Security on February 12, 2007, is
substituted for Jo Anne B. Barnhart in this action; *see also* 42 U.S.C.
§ 405(g) ("Any action instituted in accordance with this subsection
shall survive notwithstanding any change in the person occupying the
office of Commissioner of Social Security or any vacancy in such
office.")

² A person is eligible for supplemental security income benefits
if he is "disabled" (as that term is defined elsewhere in the
regulations) and his income and financial resources are below a
certain level.  42 U.S.C. § 1382(a).  To be granted a period of
disability and receive disability insurance benefits, a claimant must
show that he contributed to the insurance program, is under retirement

denied, Plaintiff's motion is denied in part, and the matter is remanded for further consideration in light of the analysis which follows.

## II. BACKGROUND

### A. Factual Background

Jolindo Carrara worked for some 13 years as a school bus driver, the longest of numerous jobs he held between 1989 and 2001. (Transcript of Related Proceedings, Docket No. 6, "Tr.," 88-91.) In 2001, he was working as a technician in a photography lab at a major drugstore chain. When he was late arriving for work for the twentieth time, he was fired from that job. Mr. Carrara blamed his chronic tardiness on his obsessive-compulsive disorder, including a compulsion to rewash himself if he touched the shower curtain while he was bathing.

Mr. Carrara had undergone some psychiatric counseling while he was a teenager, but did not receive any further care until 2002 when he began seeing a psychiatrist, Dr. Charles Kaczey, through the public mental health service in Cambria County, Pennsylvania. In October 2004, Dr. Kaczey diagnosed Mr. Carrara with chronic paranoid schizophrenia in moderate remission. (Tr. 308.)

In addition to his mental health problems, Mr. Carrara was

---

age, and became disabled prior to the date on which he was last insured. 42 U.S.C. § 423(a). Administrative Law Judge Mulrooney concluded (Tr. 18), and the parties do not dispute, that Mr. Carrara was required to show that he became disabled no later than December 31, 2006.

also diagnosed with multiple physical impairments, including mixed connective tissue disorder, pituitary gland disorders, diabetes, and degenerative disc disorder.

B.  Procedural Background[3]

On June 4, 2004, Mr. Carrara filed applications for disability insurance benefits and supplemental security income benefits, claiming his ability to work was limited due to depression, mood swings, stress, sinusitis, back problems, diabetes, acid reflux, and pituitary gland problems. (Tr. 83-87; 314-318; 94.) After the applications were denied on February 23, 2005(Tr. 60-64; 319-323), Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ"); the requested hearing was held on March 14, 2006, before the Honorable John J. Mulrooney II, where Mr. Carrara was represented by counsel. (Tr. 330-364.) Judge Mulrooney also denied benefits in a decision dated May 8,

---

[3]  According to an opinion issued by ALJ Melvin Benitz on February 4, 2004, Mr. Carrara originally filed applications for DIB and SSI on October 23, 2000. After those applications were denied initially and in an opinion issued on April 3, 2002, Plaintiff appealed to the Social Security Appeals Council, but apparently did not seek judicial review of the Council's subsequent decision affirming the ALJ's opinion. A second set of applications filed on June 30, 2002, alleging disability as of July 31, 2001, was also denied initially and upon review by Judge Benitz. (*See* ALJ's opinion of February 4, 2004, Tr. 42-49.) As a threshold matter in this case, Judge Mulrooney determined that Mr. Carrara had provided no new material evidence which would warrant reconsideration of the conclusions reached in the February 4, 2004 decision, and declined to re-open that decision. (Tr. 18.) Plaintiff raises no objection to this determination in his brief in support of the motion for summary judgment. Therefore, as did the ALJ, this Court will refer to medical and other evidence of record dating from before February 4, 2004, only for purposes of providing a longitudinal picture of Plaintiff's disability status.

3

2006.  (Tr. 348-364.)  This decision was affirmed by the Appeals
Council on August 18, 2006. (Tr. 6-8.)  Therefore, the May 8, 2006,
opinion of the ALJ became the final decision of the Commissioner
for purposes of review.   42 U.S.C. § 405(h); Rutherford v.
Barnhart, 399 F.3d 546, 549-550 (3d Cir. 2005), citing Sims v.
Apfel, 530 U.S. 103, 107 (2000).  Plaintiff filed suit in this
Court on October 19, 2006, seeking judicial review of the ALJ's
decision.

C.    Jurisdiction

This Court has jurisdiction by virtue of 42 U.S.C.
§ 1383(c)(3) (incorporating 42 U.S.C. § 405(g)) which provides that
an individual may obtain judicial review of any final decision of
the Commissioner by bringing a civil action in the district court
of the United States for the judicial district in which the
plaintiff resides.

III. **STANDARD OF REVIEW**

The scope of review by this Court is limited to determining
whether the Commissioner applied the correct legal standards and
whether the record, as a whole, contains substantial evidence to
support the Commissioner's findings of fact.  42 U.S.C. § 405(g);
Richardson v. Perales, 402 U.S. 389 (1971); Schaudeck v. Comm'r of
Soc. Sec. Admin., 181 F.3d 429, 431 (3d Cir. 1999).  Findings of
fact by the Commissioner are considered conclusive if they are
supported by "substantial evidence," a standard which has been

4

described as requiring more than a "mere scintilla" of evidence, that is, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, id. at 401. "A single piece of evidence will not satisfy the substantiality test if the [ALJ] ignores, or fails to resolve, a conflict created by countervailing evidence." Kent v. Schweiker, 710 F.2d 110, 114 (3d Cir. 1983).

This Court does not undertake de novo review of the decision and does not re-weigh the evidence presented to the Commissioner. Schoengarth v. Barnhart, 416 F. Supp.2d 260, 265 (D. Del. 2006), citing Monsour Medical Center v. Heckler, 806 F.2d 1185, 1190 (3d Cir. 1986) (the substantial evidence standard is deferential, including deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence.) If the decision is supported by substantial evidence, the Court must affirm the decision, even if the record contains evidence which would support a contrary conclusion. Panetis v. Barnhart, CA No. 03-3416, 2004 U.S. App. LEXIS 8159, *3 (3d Cir. Apr. 26, 2004), citing Simmonds v. Heckler, 807 F.2d 54, 58 (3rd Cir. 1986), and Sykes v. Apfel, 228 F.3d 259, 262 (3rd Cir. 2000).

## IV. **LEGAL ANALYSIS**

### A. The ALJ's Determination

In determining whether a claimant is eligible for SSI or DIB benefits, the burden is on the claimant to show that he has a

5

medically determinable physical or mental impairment (or combination of such impairments) which is so severe he is unable to pursue substantial gainful employment[4] currently existing in the national economy. The impairment must be one which is expected to result in death or to have lasted or be expected to last for not less than twelve months. 42 U.S.C. § 1382c(a)(3)(C)(i); Morales v. Apfel, 225 F.3d 310, 315-316 (3d Cir. 2000).

To determine a claimant's rights to either type of Social Security benefits,[5] the ALJ conducts a formal five-step evaluation:

    (1)   if the claimant is working or doing substantial gainful activity, he cannot be considered disabled;

    (2)   if the claimant does not suffer from a severe impairment or combination of impairments that significantly limits his ability to do basic work activity, he is not disabled;

    (3)   if the claimant does suffer from a severe impairment which meets or equals criteria for an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings") and the condition has lasted or is expected to last continually for at least twelve months, the claimant is considered disabled;

    (4)   if the claimant retains sufficient residual functional

---

[4] According to 20 C.F.R. § 416.972, substantial employment is defined as "work activity that involves doing significant physical or mental activities. . . . Work may be substantial even if it is done on a part-time basis." "Gainful work activity" is the kind of work activity usually done for pay or profit.

[5] The same test is applied whether the claimant is seeking DIB or SSI benefits. Burns v. Barnhart, 312 F.3d 113, 119, n1 (3d Cir. 2002). Therefore, courts routinely consider case law developed under both types of claims.

capacity[6] ("RFC") to perform his past relevant work, he is not disabled; and

(5) if, taking into account the claimant's RFC, age, education, and past work experience, the claimant can perform other work that exists in the local, regional or national economy, he is not disabled.

20 C.F.R. § 416.920(a)(4); see also Morales, 225 F.3d at 316.

In steps one through four, the burden is on the claimant to present evidence to support his position that he is entitled to Social Security benefits, while in the fifth step the burden shifts to the Commissioner to show that the claimant is capable of performing work which is available in the national economy. Gorecki v. Massanari, 197 F. Supp.2d 154, 159 (M.D. Pa. 2001), citing Fargnoli v. Massanari, 247 F.3d 34, 39 (3d Cir. 2001).

Following the prescribed analysis, Judge Mulrooney first concluded that Mr. Carrara had not engaged in substantial gainful activity at any time after the prior decision denying benefits was issued, i.e., February 4, 2004. (Tr. 18.) At step two, he found that Plaintiff suffered from numerous serious physical impairments, i.e., status post cervical spinal fusion, status post maxillar facial reconstruction, arthritis, osteopenia,[7] a history of mixed

---

[6] Briefly stated, residual functional capacity, or RFC, is what a claimant can do despite his recognized limitations. Social Security Ruling 96-9 defines RFC as "the individual's maximum remaining ability to perform work on a regular and continuing basis, i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule." See also 20 C.F.R. § 416.945.

[7] Osteopenia is the reduction in bone volume to below normal levels, especially due to inadequate replacement of bone lost to normal cell disintegration or dissolution. See the National Institute

7

connective tissue disorder, peripheral neuropathy,[8] lumbar degenerative disc disease, obesity, a pituitary microadenoma[9] with hypogonadism,[10] diabetes mellitus, and syndrome X,[11] all of which were "severe"[12] as that term is defined by the Social Security

---

of Medicine's on-line website, Medline Plus, at
www.nlm.nih.gov/medlineplus/mplusdictionary (last visited July 24,
2007), "Medline Plus."

[8]   Peripheral neuropathy is a condition in which the peripheral
nerves that carry information between the central nervous system and
the muscles, skin, joints, and other organs fail to function properly,
resulting in pain, loss of sensation, or inability to control muscles.
Damage to nerves can result from one of the specific conditions
associated with neuropathy, including hereditary disorders, systemic
or metabolic disorders (e.g., diabetes), infectious or inflammatory
conditions, exposure to toxic compounds, and neuropathy secondary to
the use of specific drugs. *See* medical encyclopedia at Medline Plus.

[9]   A pituitary microadenoma, or prolactinoma, is a non-cancerous
tumor which produces prolactin, a hormone which triggers lactation and
plays a role in sexual desire. In men, a pituitary microadenoma may
result in enlargement of breast tissue, infertility, impotence,
decreased sexual interest, headaches and visual changes. The
condition can usually be controlled with drugs but may require surgery
in severe cases. *See* medical encyclopedia at Medline Plus.

[10]   Hypogonadism is defined as the functional incompetence of the
gonads especially in the male with subnormal or impaired production of
hormones and germ cells. *See* medical dictionary at Medline Plus.

[11]   Syndrome X is a metabolic syndrome marked by the presence of
three or more of a group of factors such as high blood pressure,
abdominal obesity, high triglyceride levels, low HDL levels, and high
fasting levels of blood sugar which are linked to an increased risk of
cardiovascular disease and Type II diabetes. *See* medical dictionary
at Medline Plus.

[12]   *See* 20 C.F.R. §§ 404.1520(c), 404.1521(a), and 140.1521(b),
stating that an impairment is severe only if it significantly limits
the claimant's "physical ability to do basic work activities," i.e.,
"abilities and aptitudes necessary to do most jobs, including, for
example, walking, standing, sitting, lifting, pushing, pulling,
reaching, carrying or handling," as compared to "a slight abnormality"
which has such a minimal effect that it would not be expected to
interfere with the claimant's ability to work, regardless of his age,
education, or work experience. Yuckert, 482 U.S. at 149-151. The

8

Administration.    (Tr. 19.)  The ALJ also considered Plaintiff's other physical impairments - hyperlipidemia, hypertension, nasal wall collapse, sinusitis, allergies, gastroesophageal reflux disease, acid reflux, and a hiatal hernia - but concluded that those conditions were not severe inasmuch as they did not result in any serious limitations on Plaintiff's ability to perform substantial gainful employment.[13]  (Tr. 19-20.)

At step two, the ALJ also considered Plaintiff's mental impairments, i.e., major depressive disorder, dysthymia,[14] personality disorder NOS, schizophrenia, obsessive compulsive disorder, and anxiety disorder NOS.  He concluded that those conditions were severe inasmuch as they imposed serious limitations on Mr. Carrara's ability to work.  (Tr. 19.)

Judge Mulrooney concluded at step three of his analysis that Mr. Carrara's impairments, taken alone or in combination, did not satisfy any of the criteria in 20 C.F.R. Part 404, Subpart P, Appendix 1, specifically the Listings defined in Sections 1.00, (musculoskeletal system), 9.00 (endocrine system), 11.00 (neurological), or 14.00 (immune system.)  (Tr. 20-22.)  At this

claimant has the burden of showing that the impairment is severe.  Id. at 146, n5.

[13]  Plaintiff does not dispute this finding and therefore these impairments will not be discussed further.

[14]  Dysthymia is a mood disorder characterized by chronic mildly depressed or irritable mood often accompanied by other symptoms such as eating and sleeping disturbances, fatigue, and poor self-esteem. See medical dictionary at Medline Plus.

9

step, the ALJ also considered the effects of Plaintiff's morbid obesity vis-a-vis the relevant Listings as addressed in Social Security Ruling[15] ("SSR") 02-1p, concluding that his obesity was a severe impairment and that limitations caused thereby would be considered throughout the remainder of his analysis.  (Tr. 22-23.)

The ALJ reviewed Plaintiff's mental impairments according to the regulations set out in 20 C.F.R. § § 404.1520 and 416.920,[16] but concluded that they did not satisfy the criteria for meeting Listings 12.03 (schizophrenic, paranoid and other psychotic

---

[15] "Social Security Rulings are agency rulings published 'under the authority of the Commissioner of Social Security' and 'are binding on all components of the Social Security Administration.'" Sykes, 228 F.3d at 271, citing 20 C.F.R. § 402.35(b)(1).  "Rulings do not have the force and effect of the law or regulations but are to be relied upon as precedents in determining other cases where the facts are basically the same." Sykes, id., quoting Heckler v. Edwards, 465 U.S. 870, 873 n3 (1984).

[16] The Social Security Administration has developed a special technique for reviewing evidence of mental disorder claims.  Listings 12.03, 12.04, and 12.06 are similar in that each sets out three categories which measure the severity and effects of the claimant's impairment, commonly referred to as the A, B, and C criteria.  To meet these listings, the claimant must satisfy the A criteria plus two of the four B criteria, or, alternatively, satisfy the C criteria.  The A criteria require medically documented evidence of characteristics commonly associated with the particular disorder.  The B criteria measure the severity of the impairment by requiring evidence of "marked" restrictions in three areas, i.e., activities of daily living; maintaining social functioning; maintaining concentration, persistence, or pace; the fourth B criterion is repeated episodes of decompensation, each of extended duration.  The C criteria of Listings 12.03, 12.04, and 12.06 differ somewhat, but the claimant must present medical evidence of the duration of his disorder and show that the impairment results in "more than a minimal limitation of ability to do basic work activities," e.g., repeated episodes of decompensation or the inability to function outside his home.  Listing 12.08 requires evidence of "deeply ingrained maladaptive patterns of behavior" associated with one of six personality traits, together with two of the same four B criteria as in Listings 12.03, 12.04, and 12.06.

10

disorders), 12.04 (affective disorders), 12.06 (anxiety-related disorders), or 12.08 (personality disorders.)   (Tr. 24-27.)

At step four, the ALJ concluded that Plaintiff retained the physical ability to perform work at the light exertional level[17] provided he was not required to perform the full range of arm and legs maneuvers or finger actions and only occasional postural maneuvers such as balancing, stooping, kneeling, crouching, climbing ramps and stairs, overhead reaching, and pushing and pulling with the upper extremities, including the use of hand levers.   The ALJ also concluded that because of his non-exertional limitations,[18] Plaintiff was limited to work which involved no more than simple, routine, repetitive tasks, was not performed in a fast-paced production environment, involved only simple, work-related decisions, relatively few work place changes, and no more

---

[17]   "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.   To be considered capable of performing a full or wide range of light work, [the claimant] must have the ability to do substantially all of these activities."   20 C.F.R. §§ 404.1567(b) and 416.967(b).   A person who can do light work is also assumed to be able to do sedentary work unless there are limiting factors such as loss of fine dexterity or the inability to sit for long periods of time.   Id.

[18]   Exertional limitations are physical limitations which affect a claimant's ability to meet the strength demands of a job such as sitting, standing, walking, lifting, etc.   20 C.F.R. § 416.969a(b). Non-exertional limitations are limitations imposed by impairments affecting one's ability to meet non-strength requirements, for example, nervousness, anxiety, depression, and difficulty concentrating or understanding detailed instructions.   20 C.F.R. § 416.969a(c).

11

than occasional interaction with supervisors, coworkers, and the general public. (Tr. 27.)  The ALJ further found that Mr. Carrara could not perform his previous relevant work as either a school bus driver or a photo lab technician which the vocational expert ("VE") at the hearing, Dr. Morton Morris, classified as semi-skilled, light to medium work activity. (Tr. 358-360.)

In response to the ALJ's hypothetical question, Dr. Morris testified that there were numerous unskilled light jobs such as injection mold press operator, bench assembler, and toy or cushion stuffer which individual of Mr. Carrara's age, education, and physical/mental limitations could perform in the local or national economy. (Tr. 360.)  Therefore, based on Plaintiff's status as an individual "closely approaching advanced age"[19] with a high school education, a work history of semi-skilled occupations which did not provide transferrable skills, the medical evidence in the record, Plaintiff's testimony, behavior and demeanor at the hearing, and the testimony of the vocational expert, the ALJ determined at step five that Mr. Carrara was not disabled at any time between February 5, 2004, and the date of his decision.  Consequently, he was not entitled to DIB or SSI benefits. (Tr. 32-33.)

Plaintiff's principal argument in support of his motion for summary judgment is that although the ALJ correctly stated the

---

[19]  Plaintiff was born on March 1, 1956, and was 50 years old at the time of the hearing, meaning that he was within the category described as "closely approaching advanced age," i.e., between 50 and 54.  20 C.F.R. § 416.963(d).

12

regulations by which medical opinions are to be weighed in determining the scope and severity of a claimant's impairments, he failed to give appropriate weight to the opinions of Plaintiff's treating psychiatrists, two psychologists who each examined him on a single occasion, and a non-examining state medical consultant who reviewed his file in December 2004.[20] (Plaintiff's Brief in Support of Motion for Summary Judgment, Docket No. 12, at 16-19.) Before considering the ALJ's decision in this regard, we summarize those opinions in some detail.

B.   Medical Evidence of Plaintiff's Mental Impairments

1. *Dr. Charles Kaczey:*   Dr. Kaczey, a psychiatrist, treated Mr. Carrara for some period through the Cambria County Mental Health/Mental Retardation agency, then continued providing treatment through the outpatient psychiatric clinic of the Alternative Community Resource Program ("ACRP") beginning in January 2003.   According to a report prepared on July 27, 2004, Plaintiff's diagnoses at that time were major depressive disorder,

---

[20]   Plaintiff argues that the ALJ erred in his analysis of his physical impairments as well by rejecting the opinion of Dr. Samuel Massoud, a consulting physician who found that he was limited to less than a full range of sedentary work.   Plaintiff contends that when his age is taken into consideration with this limitation, he should have been found presumptively disabled. (Plf.'s Brief at 17, 19; *see also* Tr. 223-231.) Because we conclude that the ALJ erred in considering Plaintiff's mental condition and will remand this case for further analysis of that issue, we need not address this alternative argument.   However, on remand, Plaintiff's physical impairments should, of course, be discussed in the ALJ's analysis.

13

single episode, moderate, and obsessive-compulsive disorder.[21]  His GAF score[22] was 55.  Mr. Carrara was described as having psychomotor activity, speech characteristics, and stream of thought all within normal ranges although he hesitated before answering questions. His mood was a combination of depression and confusion with constrictive affect.  He reported no current hallucinations or illusions and appeared to be of average intelligence.  Plaintiff reported that he could work only 15-20 minutes before taking a break; bathed only 2 or 3 times a week; did not do much cooking; and experienced an overall lack of energy and almost constant pain in his neck and left shoulder.  Sometime after December 2, 2003, Plaintiff had received an eviction notice, in part because of "unfit living conditions."  His medications as of July 2004 were

---

[21]  Obsessive-compulsive disorder is an anxiety disorder characterized by recurrent thoughts, feelings, ideas or sensations (obsessions) or behaviors that make a person feel driven to perform certain acts (compulsions.)  These obsessions and compulsions are not associated with medical illness or drug use but cause significant distress or interfere with everyday life.  The person usually recognizes that the behavior is excessive or unreasonable.  The disorder is treated using medication and psychotherapy to reduce anxiety, resolve inner conflicts, and provide effective ways of reducing stress.  *See* medical encyclopedia at Medline Plus.

[22]  The Global Assessment of Functioning or GAF scale assesses how well an individual can function according to psychological, social, and occupational parameters, with the lowest scores assigned to individuals who are unable care for themselves.  Drejka v. Barnhart, CA No. 01-587, 2002 U.S. Dist. LEXIS 7802, *5, n2 (D. Del. Apr. 18, 2002).  A GAF score of 51-60 indicates moderate symptoms, such as a flat affect, or moderate difficulty in social or occupational functioning.  Id.  A GAF score may be "of considerable help" in determining a claimant's RFC, but an ALJ is not required to determine disability based solely on the score.  *See* Ramos v. Barnhart, CA No. 06-1527, 2007 U.S. Dist. LEXIS 23561, *33-*34 (E.D. Pa. Mar. 30, 2007), and cases cited therein.

14

Effexor XR 150 mg twice a day and Risperdal 0.5 mg twice a day;[23] his prognosis was poor.  (Tr. 204-206.)

On October 15, 2004, Dr. Kaczey completed an employability assessment form for the Pennsylvania Department of Public Welfare. His conclusion, based upon Plaintiff's clinical history, appropriate tests and diagnostic procedures, and multiple psychiatric mental status evaluations, was that Plaintiff was permanently disabled and a candidate for Social Security DIB or SSI due to his diagnosis of chronic paranoid schizophrenia,[24] in moderate remission.  (Tr. 307-308.)

Lynette J. Sottile at ACRP performed a psychosocial evaluation on February 18, 2005.  In it, she noted that Mr. Carrara lived

---

[23]    Effexor (venlafaxine) is used to treat depression.  In its extended release (XR) form, it is also used to treat generalized anxiety disorder, social anxiety disorder, and panic disorder. Effexor is one of a class of medications called selective serotonin and norepinephrine re-uptake inhibitors ("SSRIs") which work by increasing the amounts of serotonin and norepinephrine, natural substances in the brain that help maintain mental balance.  Risperdal (risperidone) is used to treat the symptoms of schizophrenia, episodes of mania, or mixed episodes in patients with bipolar disorder.  It is in a class of medications called atypical antipsychotics which work by changing the activity of certain natural substances in the brain.  *See* drugs and supplements at Medline Plus.

[24]    Schizophrenia is a mental disorder in which the person has difficulty telling the difference between real and unreal experiences, thinking logically, responding normally to others, and behaving normally in social situations.  Paranoid schizophrenia is one of five recognized types of the disorder, of which the key symptoms are delusions and auditory hallucinations.  It usually does not involve the disorganized speech and behavior that is seen in other types of schizophrenia.  Patients with paranoid schizophrenia typically are tense, suspicious, guarded, and reserved, often with feelings of being persecuted or plotted against.  Affected individuals may have grandiose delusions associated with protecting themselves from the perceived plot.  *See* medical encyclopedia at Medline Plus.

alone and had completed one year of theater arts and television programming at the college level. He enjoyed playing on the computer, singing, photography, writing to a reader's forum, and composing poetry. She described Plaintiff as "creative and intelligent." His symptoms at the time included sleep and appetite disturbances, feelings of worthlessness and hopelessness, heart palpitations, crying spells, nervousness, decreased pleasure, excessive ruminations, sweaty palms, and decreased energy. Mr. Carrara was currently in litigation for causing fires in his apartment. He was described as appropriately dressed and groomed at the interview, with fair hygiene. His eye contact was normal and appropriate; he was oriented as to person, place and time. His memory for recent and remote events was intact. He denied and showed no evidence of visual hallucinations, delusions, dissociation, or illusions currently or in the past but did report hearing voices. There was no evidence of anxiety during the interview, but he reported feeling jittery and nervous and had difficulty breathing. He denied homicidal ideation at the time but indicated that he had felt homicidal in the past and used to get into fights regularly. He reported a history of suicidal ideation but none at present. There was no evidence of any formal thought disorder or of paranoid thinking. Ms. Sottile further noted, "There is no evidence to suggest that this client has no [sic] been truthful in response to the interview questions." She recommended

continued medication management with Dr. Kaczey and individual psychotherapy. (Tr. 255-257.)

In an ACRP treatment plan dated March 17, 2005, Plaintiff's diagnosis was identified as obsessive-compulsive disorder, with a current GAF of 55, which was also his highest GAF for the previous year. The plan noted depressed affect and extreme or consistent distrust of others without sufficient basis. He also experienced "severe paranoia which greatly impacts his mood." Short term treatment goals included increasing enjoyment of life; gaining insight into his obsessive-compulsive and paranoid behaviors; and reducing or eliminating ritualistic behaviors and paranoid ideation regarding staff, family, other members of his counseling group and the public. The long term goals were to "develop the ability to recognize, accept and cope with the feelings of depression through medication treatment, therapy or treatment in a partial hospital program;" to demonstrate more stability of mood in his individual therapy sessions; to report reduced suspicion around others as well as being more relaxed, trusting and open in interactions; and to decrease his paranoia by a minimum of 20%. (Tr. 259-260.)

In a letter to Plaintiff's counsel dated May 12, 2005, Dr. Kaczey stated that "due to the following diagnoses and their symptoms, it is not possible for Mr. Carrara to work due to the chronicity and severity of his mental health impairments." He then described the characteristics of the three conditions with which

17

Plaintiff had been diagnosed - major depressive disorder, moderate, chronic; obsessive-compulsive disorder; and paranoid schizophrenia, chronic. (Tr. 240-241.)

The record also includes notes from an evaluation performed at ACRP on July 20, 2005. Plaintiff was again upset about being evicted for setting fire to his stove, which he denied doing. He continued to report sleep and appetite disturbances. He said the voices he heard were "the usual," and he talked to himself a lot. His hygiene was "somewhat" impaired. Although he demonstrated good eye contact, his affect was blunted and his mood was described at various points as depressed, irritable, negativistic, and victimized. His thoughts were logical and reality based with no evidence of hallucinations, delusions or suicidal or homicidal ideation. As of that date, his diagnoses were major depression, moderate, chronic and personality disorder NOS with antisocial and histrionic traits. (Tr. 258.)

2. *Dr. Parekh:* Sometime between May 2005 and February 2006, Plaintiff changed psychiatrists and began seeing Dr. Parekh (first name illegible), also at ACRP. On February 8, 2006, Dr. Parekh completed a form entitled "Medical Assessment of Ability to Do Work-Related Activities - Mental." (Tr. 305.) In that report, Dr. Parekh indicated that Mr. Carrara had good to fair ability to make most occupational adjustments, but no ability to deal with work stresses. He noted

18

[a]lthough Jolindo has the ability to follow work rules, his cognitive distortions (the way he perceives others) are often defensive and feel persecutory to him. This often results in Jolindo responding in anger and then he gets stuck on the perceived injustice and ruminates on it for a very long time, which impedes his ability to adjust to a job and people.

(Tr. 305.)

He further noted with regard to making performance adjustments, "Jolindo has the intellectual and memory ability to carry out job instructions. However, . . . his paranoid and obsessive thoughts would impede his ability to organize instructions due to cognitive distortions." (Tr. 306.) Dr. Parekh also commented that while Plaintiff had a fair ability to behave in an emotionally stable manner, react predictably in social situations, and demonstrate good reliability, Mr. Carrara was unable to maintain his personal appearance.

Due to obsessive-compulsive traits, Jolindo's hygiene is a major problem. His compulsions often take hours in relation to hygiene and [he] becomes exhausted with hours of rituals regarding showering and hygiene. Jolindo's mood also became labile when his mood regresses and his behaviors become unpredictable regarding crying spells and fits of anger. [His] depressed symptoms, as well as anxiety, impede Jolindo's ability to function on a consistent day-to-day basis.

(Tr. 306.)

3. *Dr. Tammy Haslett:* On November 23, 2004, Tammy Haslett, Ph.D., a licensed psychologist, examined Mr. Carrara at the request of the Pennsylvania Bureau of Disability Determination. (Tr. 207.) She reported that Plaintiff independently traveled to

19

the interview by bus and was on time. Throughout the session, his cooperation was good; he was compliant, well-mannered, and displayed adequate self-sufficiency and a positive attitude. He was oriented to person, time and place. Plaintiff "performed adequately" when answering questions and appeared to be a "fairly good reporter of his symptoms and his personal history." (Tr. 208.) However, she also reported that his hygiene was poor and his appearance unkempt with ill-fitting clothes and long hair.

Asked about his obsessive-compulsive disorder, Plaintiff reported, "I have a thing for garbage," stating that if he was near garbage, even if he did not touch it, he wanted to wash his hands. Although garbage made him "nauseous," he could remove it from his home. He also stated that he washed his hands "countless" times every day and washed the faucet handles at same time. His showers were limited to three times a week because they took two hours, during which he had periods of disorientation and slowing down. Dr. Haslett reported that Plaintiff did not exhibit obsessive behaviors during the interview itself.

Plaintiff's records from ACRP[25] and his own self-report indicated that he had no current auditory, visual or tactile hallucinations. He did explain that he got "feedback about his

---

[25]  It appears Dr. Haslett had access to the records from ACRP since she refers to his medications and diagnoses of major depressive disorder, single episode, moderate, and obsessive-compulsive disorder. (Tr. 207.)  She also noted that according to his records, he had not received any inpatient mental health treatment.

20

life questions" by watching television and commented that Dr. Kaczey thought this was "unusual." (Tr. 207.) He reported no episodes of derealization or depersonalization and denied legal altercations, suicidal ideation, or feelings of guilt. His energy reportedly fluctuated and his sleep patterns were variable, i.e., he could sleep for hours during the day. He stated that when he was non-compliant with his medication, he had "fitful sleep" and problems with hearing an "edgier and more hostile voice," but "he could not make sense of the medication." [Sic.]   (Tr. 208.)

Mr. Carrara described his usual mood as "generally down" and reported that he got into fights with friends and was about to be evicted from his apartment because his landlord accused him of starting fires, which he denied. After the purported fires, the landlord removed the stove from the apartment, forcing him to prepare his meals using only a microwave oven. He also reported that his landlord "constantly comes into his home and dictates how clean the house should be," but admitted that clutter prevented the landlord from maintaining the apartment properly. (Tr. 208.)

Dr. Haslett summarized Plaintiff's sporadic work history going back to 1971, most of which was for periods of a year or less before he quit or was laid off. One exception was a period of 13 years working as a school bus driver. His last job was at large chain drugstore working as a photo lab technician for one or two years until 2001. He reported that he did not feel comfortable

21

working or "being ordered around" and that he could not follow a schedule to get ready for work on time. (Tr. 208-209.)

Dr. Haslett's mental status report noted that Plaintiff knew his current address and could identify the year, season, date, day and month. He knew why he was participating in the evaluation and his remote, recent past, and recent memories did not appear to be impaired. Although he appeared to have low energy, he was able to sustain attention for the entire interview. His speech was normal with no disturbance in language and he displayed no disturbances in psychomotor activity. He reported his mood at the time as "normal" and "not very good." His affect was appropriate with a restricted range. His thoughts were easily distracted but also easily redirected.

The psychologist concluded that Plaintiff had no preoccupations, although he did express negative thoughts – perhaps delusions – about his landlord. His abstract reasoning was good and his store of information and general intelligence levels were within normal limits. She discerned no significant problems with impulse control and concluded that his insight was fair and his judgment adequate. Her diagnoses were dysthymia, anxiety NOS, and rule out personality disorder NOS. She concluded his present GAF was 70 (indicating no more than mild depression) and that his psychosocial stressors were moderate but did not note what they might be. (Tr. 210.)

22

Dr. Haslett also completed a form entitled "Medical Source Statement of Ability to Do Work-Related Activities (Mental)" in which she indicated no more than moderate difficulties in making simple work-related decisions, interacting appropriately with supervisors and co-workers, and responding appropriately to changes in a routine work setting. All other activities were considered to present no more than mild difficulty, at most. (Tr. 211.)

4. *Dr. Daniel Palmer:* Dr. Daniel Palmer, a clinical psychologist, evaluated Plaintiff on March 30, 2006. He described Mr. Carrara as appearing at the interview poorly dressed in stained clothing with very dirty long hair, smelling heavily of body odor, and unshaven. While he was attentive and cooperative, he would often respond to questions with irrelevant information. He cried often during the interview and appeared clinically depressed.

Mr. Carrara described chronic problems with depression, feelings of worthlessness and hopelessness, crying spells, mood swings involving impulsive expression of verbal anger, problems with impulse control, and sleep disturbances (i.e., sleep onset insomnia, frequent awakenings during the night, and frequent night sweats.) He did not report suicidal or homicidal ideation or attempts nor visual or auditory hallucinations, but did discuss chronic delusional activity (e.g., getting answers to questions from television) for "several decades." He had not undergone psychiatric hospitalizations, but re-entered psychological

23

counseling "four or five years ago," and was currently being treated at ACRP with twice-monthly counseling and checks by a psychiatrist every two months.  His medications at that time were Effexor, Seroquel, and Lexapro for his mental health problems and Topamax for neuropathy.[26]

Dr. Palmer further noted Plaintiff's report that he had great difficulty cleaning his home and had been evicted the previous year because other residents were apparently complaining about odors emanating from his apartment.  There were no other reports of behavior problems or criminal charges.  During the interview, Plaintiff demonstrated no psychomotor abnormalities and his receptive and expressive speech functions appeared intact. Although his thought processes were very slow and concrete, there was no evidence of loose associations or active psychotic processes.  While it took him a minute to respond to questions about interpretation of proverbs, he was able to offer reasonable responses.  He demonstrated a reasonable amount of common knowledge and could solve simple multiplication and division problems, but had difficulty subtracting serial sevens from 100, demonstrating a slow work pace and several errors.  He denied problems with memory

---

[26]  Among other uses, seroquel (quetiapine) is used to treat the symptoms of schizophrenia.  Like Risperdal, it is also an atypical antipsychotic which works by changing the activity of certain natural substances in the brain.  Lexapro (escitalopram) is an SSRI used to treat depression and generalized anxiety disorder.  Topamax (topiramate) is an anticonvulsant used with other medications to treat certain types of seizures and neuropathy.  *See* drugs and supplements at Medline Plus.

functions but could recall only four digits forward and three backward, exhibiting poor short-term recall. Dr. Palmer considered his judgment and insight impaired as a result of his psychiatric symptomatology.

Dr. Palmer administered an objective test known as the Beck Depression Inventory to assess Plaintiff's psychological functioning. Mr. Carrara scored 32 on the inventory, ranking him in the seriously depressed range. Dr. Palmer's diagnosis was major depressive disorder, severe, with psychotic features and a poor prognosis for positive change. He concluded

Given Jolindo's presentation, report and test results, I do possess serious questions regarding his capacity to accurately process, retain, and implement directives, to sustain attention to tasks, to relate appropriately with others and to tolerate stressors in the environment.

(Tr. 309-312.)

5. *Dr. Frank M. Mrykalo:* On December 16, 2004, Frank M. Mrykalo, Ed.D., completed a form entitled "Residual Functional Capacity Assessment - Mental" based on his review of Plaintiff's records as of that date. In his estimation, Mr. Carrara demonstrated, at most, moderate limitations in understanding and memory and in his ability to remember and understand detailed instructions. Regarding concentration and persistence, he again exhibited at most, moderate limitations in his ability to carry out detailed instructions, maintain attention and concentration for extended periods, perform activities within a schedule, maintain

25

regular attendance and be punctual, and make simple work related decisions. According to Dr. Mrykalo, Plaintiff would be able to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. He had no more than moderate limitations in his social interactions (e.g., the ability to accept instruction and respond appropriately to criticism from supervisors) and in adaptation (e.g., the ability to respond appropriately to changes in the work setting.)[27]   (Tr. 213-214.)

Dr. Mrykalo also completed a Psychiatric Review Technique Form indicating that evidence in the file supported the conclusion Plaintiff suffered from an affective disorder (Listing 12.04) and an anxiety related disorder (Listing 12.06.)   However, when considering the elements of those listings,[28] he concluded Mr. Carrara had no more than mild limitations in performing activities of daily living, moderate difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace, and had experienced no repeated episodes of

_____

[27]  Dr. Mrykalo checked a box indicating that with regard to Plaintiff's ability to set realistic goals or make plans independently of others, he was unable to rate his ability in this category based on the available evidence.   (Tr. 214.)   According to the instructions printed on the form, this omission should have triggered a request for more specific information, but Dr. Mrykalo did not indicate what that information might be and there is no indication in the record that such information was ever provided.

[28]  See footnote 16 above.

26

decompensation. He also found no evidence of any of the C criteria. (Tr. 217-221.)

C.    Relevant Law Regarding Medical Opinions

        Social Security regulations carefully set out the manner in which medical opinions are to be evaluated.    20 C.F.R. § 404.1527(d). First, the ALJ must determine the source of the opinion regarding the claimant's impairments. There are three general categories of acceptable medical sources: treating, non-treating, and non-examining. 20 C.F.R. § 404.1502. Physicians, psychologists, and other acceptable medical sources who have provided the claimant with medical treatment or evaluation and who have had an "ongoing treatment relationship" with him are considered treating sources. A non-treating source is one who has examined the claimant but does not have an ongoing treatment relationship with him, for example, a one-time consultative examiner.   Id.   Finally, non-examining sources, including state agency medical consultants, are those whose assessments are premised solely on a review of medical records.   Id.

        Next, the ALJ must weigh the opinions of any acceptable medical source. In general, every medical opinion received is considered. Unless a treating physician's opinion is given controlling weight, the ALJ will consider (1) the examining relationship (more weight given to the opinion of an examining source than to the opinion of a non-examining source); (2) the

treatment relationship (more weight given to opinions of treating
sources); (3) the length of the treatment relationship and the
frequency of examination (more weight given to the opinion of a
treating source who has treated the claimant for a long time on a
frequent basis); and (4) the nature and extent of the treatment
relationship (more weight given to the opinions of specialist than
to generalist treating sources.) 20 C.F.R. § 404.1527(d); see also
Fargnoli, 247 F.3d at 43, and Sykes, 228 F.3d at 266, n7.   The
opinions of a treating source are given controlling weight on
questions concerning the nature and severity of the claimant's
impairment(s) when the conclusions are "well-supported by medically
acceptable clinical and laboratory diagnostic techniques and [are]
not inconsistent with the other substantial evidence in [the]
record."  20 C.F.R. § 404.1527(d)(2).

On the other hand, the opinion of a treating source that a
claimant is unable to perform substantial gainful activity is not
given controlling weight because that is the ultimate issue to be
determined and is reserved to the Commissioner.   20 C.F.R.
§ 404.1527(e).   Nor is a treating source's opinion that the
claimant is sufficiently disabled so as to be eligible for other
types of benefits (e.g., welfare benefits provided by a state
government) considered binding on the Social Security
Administration.   However, even where a medical opinion is not
entitled to controlling weight, it should not be rejected and is

28

"still entitled to deference and . . . [in] many cases, . . . will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."   SSR 96-2p, "Giving Controlling Weight to Treating Source Medical Opinions."

D.   The ALJ's Analysis of the Psychological Evidence

We conclude that although the ALJ properly stated the law relevant to weighing the medical opinions in this case, he failed to follow that law and erred in giving greater weight to the opinions of Drs. Haslett and Mrykalo than to those of Drs. Kaczey and Parekh without sufficient justification.   As a result, his analysis of the criteria of Listings 12.03, 12.04, 12.06, and 12.08 was more likely than not flawed.   We also conclude that the ALJ erred by accepting as substantial evidence the vocational expert's answer to a hypothetical question which did not incorporate all of Plaintiff's numerous psychological limitations and by failing to accept the answer to a question posed by Plaintiff's counsel which did incorporate such limitations.   Therefore, his analysis at step five was also flawed.

The ALJ acknowledged and analyzed the evidence from each of the five medical professionals.   Summarizing briefly, the ALJ:

- Rejected Dr. Kaczey's letter of May 12, 2005, in which he opined that Plaintiff could not work due to the chronic, severe nature of his mental health impairments because his assessment failed to explain how the characteristics of each diagnosis manifested themselves in Plaintiff. (Tr. 28.)

- Rejected Dr. Kaczey's October 2004 report to the

29

Pennsylvania Department of Public Welfare that Plaintiff was permanently unable to perform any gainful employment because "the form does not contain any clinical or objective findings to support his conclusion" and "included no analysis of the claimant's condition." (Tr. 28.)

- Generally rejected Dr. Kaczey's opinions as "inconsistent with the clinical and objective findings of record and with other substantial evidence, particularly the reports of the mental health experts that the claimant had normal concentration, normal memory, logical, [reality] based thoughts and at least average intelligence." (Tr. 28.)

- Stated without specific reason that he was not persuaded by Dr. Parekh's opinion dated February 8, 2006, although he conceded his opinion should be "accorded the strongest deference. . .since he is a treating psychiatrist."[29] (Tr. 28.)

- Rejected Dr. Parekh's opinion that Plaintiff's defensive cognitive distortions, inability to organize instructions, and obsessive-compulsive behaviors would severely limit his ability to work because the psychiatrist "chose to ignore the claimant's extensive abilities to complete activities of daily living [and] the assessments of other mental health examiners who did not report difficulties relating to other people, following instructions and dealing with obsessive compulsions to the degree reported by Dr. Parekh." (Tr. 29.)

- Gave "great weight" to Dr. Haslett's opinion of November 23, 2004, inasmuch "as it is rendered by an examining mental health expert, is consistent with the objective and clinical findings of record, and is not otherwise inconsistent with other substantial evidence contained in the case record." (Tr. 26.)

- Apparently gave little weight to Dr. Palmer's opinion because "Dr. Palmer is a consulting psychologist who examined the claimant on only one occasion. His opinion appears to be based primarily on the claimant's

---

[29] The Court notes for the record that Dr. Kaczey was also a treating psychiatrist, but the ALJ made no comparable finding about Dr. Kaczey's opinions.

subjective allegations." (Tr. 28.) In particular, "the final paragraph of Dr. Palmer's report was inconsistent with the balance of the narrative of his report, which indicated no memory or concentration problems." (Tr. 29.)

- Gave "significant probative weight" to Dr. Mrykalo's residual functional capacity assessment and psychiatric review technique form inasmuch as they were "consistent with and supported by the medical evidence of record." (Tr. 27.)

In sum, the ALJ rejected the opinions of Drs. Kaczey, Parekh

and Palmer because he found those opinions

are not supported by their own findings and are inconsistent with the reports of other mental health experts and medical examiners in the record, and with other substantial evidence. . . . [T]he reports of other experts do not support their opinions. Their limitations are inconsistent with the totality of the evidence.

(Tr. 29.)   Consequently, he wrote, he was "persuaded by the

findings and conclusions of the other mental health experts[30] and

the State Agency mental health expert." He concluded,

accordingly, controlling weight is not afforded the opinions of Dr. Kaczey and Dr. Parekh, and great weight is not afforded to the opinion of Dr. Palmer, insofar as they suggest an inability to perform light work activity in accordance with the above residual functional capacity.

(Tr. 29.)

We find several errors in the ALJ's analysis.   A threshold problem with the opinion rendered by Dr. Mrykalo is the fact that

---

[30]   The Court notes that the ALJ refers numerous times to the opinions of "other mental health experts" (plural) in addition to that of Dr. Mrykalo.   However, there is only one other opinion which contradicts the findings of Drs. Kaczey, Parekh, and Palmer, i.e., that of Dr. Haslett.

31

it is not based on information regarding Plaintiff's mental health condition during the entire period in question.     Dr. Mrykalo completed his file review on December 16, 2004, more than a year before the ALJ issued his decision.     That means that he did not have access to any of Dr. Kaczey's notes from 2005, Dr. Parekh's opinion from February 2006, or Dr. Palmer's assessment from March 2006.[31]     Based on his notes which appear in the record, it also seems Dr. Mrykalo did not consider Dr. Kaczey's conclusion in the October 15, 2004 disability form that Plaintiff's primary diagnosis was "paranoid schizophrenia -- chronic, moderate remission," because he mentions only the diagnosis of "MDD," which we interpret as a reference to major depressive disorder. (*Compare* Tr. 215 and 308.) Finally, the forms completed by Dr. Mrykalo contain no written analysis supporting his conclusions that Plaintiff's mental conditions imposed no more than moderate limitations in concentration, social functioning, and activities of daily living. *See* Franklin v. Barnhart, CA No. 05-2215, 2006 U.S. Dist. LEXIS 39678, *29-*32 (E.D. Pa. June 13, 2006), concluding in a similar case that the ALJ had erred where the only evidence contradicting the treating psychologist's conclusions regarding the effects of plaintiff's depression on her daily life was a form report from the

---

[31]     To the extent Dr. Haslett relied on medical records from ACRP for the period January 8, 2003, through November 23, 2004, the same problem applies to her conclusions, i.e., they are based on information which does not cover the entire period under consideration.

non-examining state psychologist which provided no details of the reasoning for his finding. Although there are a few notes by Dr. Mrykalo based on his file review, there is no analysis *per se* which would relate those notes to his ultimate conclusions regarding Plaintiff's limitations. *See* Mason, 994 F.2d at 1065, holding that a form report where a physician simply checks a box or fills in a blank is, at best, "weak evidence" and where such a report is not accompanied by a thoroughly written analysis, its reliability is "suspect;" *see also* Hippensteel v. SSA, 302 F. Supp.2d 382, 393 (M.D. Pa. 2001), *citing* 20 C.F.R. § 416.927(d)(3) (the weight given to non-examining sources will depend on the degree to which they provide supporting explanations for their opinions.)   Thus, we conclude the ALJ erred by giving Dr. Mrykalo's opinion "significant probative weight" because it was purportedly "consistent with and supported by the medical evidence of record" even though the record on which Dr. Mrykalo relied was incomplete, his opinion did not include an analysis of the facts, and it was not consistent with those of Drs. Kaczey and Parekh, Plaintiff's treating physicians. *See* Cadillac v. Barnhart, No. 03-2137, 2003 U.S. App. LEXIS 24888, *15-*16 (3d Cir. Dec. 10, 2003), holding that the ALJ erred by favoring state agency examiners' conclusions over treating physicians' opinions based on later, more complete medical records,

as well as a hands-on examination,[32] and   Hippensteel, 302 F.

Supp.2d at 393-394, noting that where a non-examining source based

his conclusions on an incomplete record, "vague references to the

record as a supporting explanation for his opinion cannot be given

great weight."

Second, the ALJ failed to explain, except in conclusory

fashion, why he gave great weight to Dr. Haslett's opinion and

declined to give equal weight to that of Dr. Palmer.   Both

psychologists examined Plaintiff on only one occasion.   Both

submitted comprehensive narratives describing their impressions of

Plaintiff's mental impairments based on their interviews. However,

the ALJ's statement that Dr. Palmer's opinion "appears to be based

primarily on the claimant's subjective allegations" fails to

consider two factors which make this reason less than persuasive.

First, Dr. Haslett's opinion is also "based primarily" on Mr.

Carrara's subjective allegations during the interview.   Second,

---

[32]  In Cadillac, two state agency physicians reviewed the
claimant's medical records in 1996, each concluding he was capable of
engaging in light activity.   2003 U.S. App. LEXIS 24888 at *4-*5.
After those assessments were completed, Cadillac's back condition was
evaluated on three separate occasions in the next year by orthopedic
surgeons.   In her opinion denying disability insurance benefits,
handed down in February 1998, the ALJ gave controlling weight to the
state agency physicians' reports and "minimal" weight to the
orthopaedists' opinions.   Id. at *8-*9.   On appeal from the district
court's opinion affirming the ALJ's decision, the Third Circuit Court
of Appeals noted that the fact the state agency physicians had
completed their assessments in 1996 meant they did not have an
opportunity to consider significant medical events which did not occur
until in 1997 and thus their opinions should not have been given
controlling weight.

unlike Dr. Haslett, Dr. Palmer actually administered an objective test, the Beck Depression Inventory, from which he concluded that Plaintiff was "seriously depressed."

In addition, we find inaccurate the ALJ's description of the final paragraph of Dr. Palmer's report as inconsistent with the rest of his report regarding Plaintiff's memory and concentration problems.    Dr. Palmer stated that although Mr. Carrara was attentive and cooperative, the interview was difficult because he would often respond with irrelevant information, a finding which would appear to reflect difficulty with concentration.  He stated Plaintiff could not offer any useful information regarding his psychiatric symptomatology, his use of certain drugs, or why he was rejected for military service, all of which could be related to memory deficits.  He also noted that Plaintiff's thought processes were "very slow and concrete" and although he denied memory problems, he could recall only four digits forward and three backward, again possible indicators of memory and/or concentration problems.  He could not subtract sevens from 100, "demonstrating a slow work pace and several errors."    These specific examples support Dr. Palmer's conclusion that he questioned Plaintiff's "capacity to accurately process, retain and implement directives."

Finally, if one compares the findings of the one-time examiners with the reports of Plaintiff's long term treating physicians, it appears Dr. Palmer's opinions, not those of Dr.

Haslett, are more consistent with the objective and clinical findings of record, contrary to the ALJ's conclusion. The failure by the ALJ to identify the specific "substantial evidence" which he found consistent with Dr. Haslett's report means this Court is unable to judge the accuracy of his statement.  While the Third Circuit Court of Appeals does not require an ALJ to use particular language or adhere to a particular format in conducting his analysis, he must provide sufficient explanation of his findings to permit "meaningful review."  <u>Jones v. Barnhart</u>, 364 F.3d 501, 505 (3d Cir. 2004), *citing* <u>Burnett v. Commissioner</u>, 220 F.3d 112, 121 (3d Cir. 2000) for the principle that an ALJ must "consider and explain his reasons for discounting all of the pertinent evidence before him in making his . . . determination."  Since the only medical evidence consistent with Dr. Haslett's opinion is Dr. Mrykalo's findings – which we have already concluded was deficient and incomplete  – and since Dr. Palmer's opinions are consistent with those of Plaintiff's treating physicians, we are unwilling to agree that the ALJ gave appropriate weight to the opinions of the consulting psychologists.

Similarly, we are unable to determine why the ALJ stated he was not persuaded by Dr. Parekh's opinion that Plaintiff's cognitive distortions, inability to organize instructions, and obsessive-compulsive behaviors would severely limit his ability to work.  The ALJ stated that Dr. Parekh "chose to ignore" Plaintiff's

ability to complete activities of daily living and the assessments of other mental health examiners who did not report impairments to the same degree as reported by Dr. Parekh. We find this analysis unpersuasive, first because the scope of the assessment Dr. Parekh completed was limited to Plaintiff's ability to do work-related activities, not his activities of daily living, and second because there is no evidence in the record that Dr. Parekh was aware of the report by Dr. Haslett, the only "mental health examiner" whose opinions disagreed with his own assessment. Thus, it can hardly be said that he "chose to ignore" that evidence. Moreover, as discussed extensively above, Drs. Kaczey and Palmer also referred to Plaintiff's cognitive distortions (e.g., his practice of getting answers to problems by watching television), his difficulty relating to other people (e.g., supervisors at work and his landlord), and his obsessive-compulsive behaviors (e.g., his repeated hand-washing and two-hour showers.)

Finally, we find the ALJ's reasons for rejecting Dr. Kaczey's opinions troublesome. His rejection of Dr. Kaczey's report to the Pennsylvania Department of Public Welfare because it contained neither clinical nor objective findings nor analysis of Plaintiff's condition to support the doctor's conclusion that Plaintiff was permanently disabled appears to be unfounded. The form does not require or request the physician to attach such reports or analysis. Moreover, Dr. Kaczey did refer to Plaintiff's

clinical history, appropriate tests and diagnostic procedures and "multiple psychiatric mental status evaluations" as the bases for his opinion.  (Tr. 308.)

The fact that Dr. Kaczey's letter of May 12, 2005, does not explain how the characteristics of each diagnosis manifested themselves should go to the weight given that letter, not Dr. Kaczey's diagnosis of major depressive disorder, obsessive-compulsive disorder and paranoid schizophrenia.  Nor should Dr. Kaczey's ultimate conclusion that due to the symptoms of those disorders Mr. Carrara was unable to work be dismissed out of hand. Although it is true that he does not explicitly relate Plaintiff's symptoms to the diagnoses in the letter, his treatment records reflect the extent and severity of Plaintiff's disorders and list multiple symptoms which correspond to the descriptions of the disorders summarized therein.  And, as the ALJ correctly notes, while the opinion of a treating physician about a claimant's ability to work is not entitled to controlling or even great weight, that opinion must still be considered.  *See* 20 C.F.R. § 404.1527, a doctor's statement that a claimant is disabled is not determinative of his disability status; *see also* SSR 96-5p, "Medical Source Opinions on Issues Reserved to the Commissioner," noting that "legal authority to draw conclusions as to a claimant's disability status is specifically reserved to the Commissioner." That Social Security Ruling goes on to state, however:

[O]ur rules provide that adjudicators must always carefully consider medical source opinions about any issue, including opinions about issues that are reserved to the Commissioner. . . . [O]pinions from any medical source on issues reserved to the Commissioner must never be ignored.

Finally, for the reasons discussed above concerning the weight which should have been given to the reports of Drs. Mrykalo and Haslett, we find that the ALJ's rejection of Dr. Kaczey's opinions as "inconsistent with the clinical and objective findings of record and with other substantial evidence" not to be an accurate reflection of the medical record as a whole.

While the ALJ may accept some parts of the medical evidence and reject others, he must consider all the evidence and give some cogent reason for discounting the evidence he rejects, particularly when he rejects evidence that suggests a contrary disposition. Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994); *see also* Morales, 225 F.3d at 317 (where there is conflict in the medical evidence, "the ALJ may choose whom to credit but cannot reject evidence for no reason or for the wrong reason") (internal quotations and citations omitted.)  If the ALJ rejects the treating physician's assessment, he may do so only on the basis of contradictory medical evidence and not due to his or her "own credibility judgments, speculation or lay opinion." Id.  As the Third Circuit Court of Appeals has directed, the ALJ must "do more than simply state ultimate factual conclusions. . . . [He] must include subsidiary findings to support the ultimate findings." Stewart v. Secretary

of HEW, 714 F.2d 287, 290 (3d Cir. 1983); see also 20 C.F.R. § 416.927(d)(2), noting "we will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion." Because we conclude the ALJ herein failed to give the proper relative weight to the opinions of the psychologists and psychiatrists who opined about the severity of Plaintiff's condition, the case must be remanded for clarification of this issue.[33]

If the ALJ failed to give proper weight to the medical opinions and evidence, it follows that his analysis at step three may have led to erroneous conclusions. For example, if one were to

---

[33] Although Plaintiff does not raise this issue, the ALJ also failed to adequately explain his credibility finding with regard to Plaintiff's subjective complaints. The law is clear that where a claimant has severe impairments that could give rise to his subjective complaints but those complaints seem excessive in light of the medical evidence, the ALJ is to evaluate the complaints as set out in 20 C.F.R. § § 404.1529 and 416.929 and pursuant to SSR 96-7p, "Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements." The ALJ properly referred to these guidelines and listed the factors which are to be considered, but concluded only, "When so evaluated, the claimant's subjective complaints are found to be exaggerated and inconsistent with the totality of the evidence, including with the clinical and objective findings of record." (Tr. 23.) However, there is no mention of any specific subjective complaint which appears to be exaggerated, the evidence of record which raises doubts about such a complaint, or the factor(s) which the ALJ actually considered. To the contrary, the medical evidence on which the ALJ relied, the reports of Drs. Haslett and Mrykalo, do not state or imply that Plaintiff exaggerated his symptoms; in fact, Dr. Haslett considered him "a fairly good reporter of his symptoms and his personal history." (Tr. 209.) The ACRP staff member who evaluated him on February 18, 2005, stated that "there is no evidence to suggest that this client has no [sic] been truthful in response to the interview questions." (Tr. 257.) Again, the cursory analysis of Plaintiff's subjective complaints does not allow the Court to evaluate the ALJ's conclusions in a meaningful way. On remand, this issue should also be revisited by the ALJ.

40

accept Dr. Parekh's opinion that Mr. Carrara's "paranoid and obsessive thoughts would impede his ability to organize instructions due to cognitive distortions," that conclusion could lead to finding marked rather than moderate limitations in concentration, persistence and pace.  Similarly, if Dr. Kaczey's comment that Mr. Carrara experienced "severe paranoia which greatly impacts his mood," and "paranoid ideation regarding staff, family other group members or the public," is given great or controlling weight, it could support a finding that he demonstrated marked limitations in his social functioning.

Similarly, we find troubling the ALJ's hypothetical question to the Vocational Expert.  The ALJ asked Dr. Morris to consider a claimant whose non-exertional impairments limited him to

>simple routine repetitive tasks not performed in the fast paced production environment involving only simple work related decisions and in general relatively few work place changes.  Assume this person is also limited to occupations which require no more than occasional interaction with supervisors, coworkers and members of the general public and by interaction I don't just mean being in the same place at the same time with people, I mean actually having to substantively interact with those people.

(Tr. 361.)

As noted above, the VE identified three unskilled, light-exertional level jobs such a hypothetical person could perform in the national or local economies.  However, in a follow-up question, Plaintiff's counsel asked the VE, "If the person working the job believes that the job should be done over and over again despite

41

perhaps the supervisor's conclusion that the job was done well enough to begin with, would that be tolerated by the employer?" Dr. Morris responded that such behavior would not be tolerated. (Tr. 362.)  However, the ALJ found that "[a] review of the record does not indicate that the claimant was limited as outlined in the question."  (Tr. 31.)   While it is true the evidence did not support the premise that Mr. Carrara's obsessive-compulsive disorder *explicitly* took the form of doing a job "over and over again despite . . .the supervisor's conclusion that the job was done well enough to begin with," we view the question asked by Plaintiff's attorney as an attempt to incorporate into the hypothetical question the *type* of limitations imposed by his obsessive-compulsive disorder.

One of the reasons the ALJ gave reduced weight to Dr. Parekh's concerns was his opinion that they were addressed to a large degree by the residual functional capacity analysis which limited Plaintiff to the above-stated non-exertional limitations. (Tr. 29.)  However, the Court cannot agree that the ALJ's question took into account all of Plaintiff's mental impairments, in particular paranoid ideations regarding persons in authority[34] and

[34]   In addition to his numerous reports of difficulties with his landlord regarding odors from his apartment and removal of the stove after he purportedly set it on fire, Mr. Carrara also testified at the hearing that he believed the store manager where he worked as a photo lab technician had deliberately written him up for tardiness in order to have a reason to fire him. (Tr. 346-348; 354-355.) *See also* comments about the manager in his activities of daily living questionnaire at Tr. 139.

his obsessive-compulsive disorder. Therefore, we conclude that the
ALJ erred by accepting as substantial evidence the VE's response to
his incomplete hypothetical question.

## V.  FURTHER PROCEEDINGS

"A district court, after reviewing the decision of the
Commissioner, may under 42 U.S.C. § 405(g) affirm, modify, or
reverse the Commissioner's decision with or without a remand to the
Commissioner for a rehearing." Newell v. Comm'r of Soc. Sec., 347
F.3d 541, 549 (3d Cir. 2003). However, the reviewing court may
award benefits "only when the administrative record of the case has
been fully developed and when substantial evidence on the record as
a whole indicates that the plaintiff is disabled and entitled to
benefits." Krizon v. Barnhart, 197 F. Supp.2d 279, 291 (W.D. Pa.
2002), *quoting* Podedworney v. Harris, 745 F.2d 210, 222 (3d Cir.
1984).

Social Security Ruling 85-15 provides in relevant part that
where a person's mental impairment is not of listing severity but

does prevent the person from meeting the mental demands
of past relevant work and prevents the transferability of
acquired work skills, the final consideration is whether
the person can be expected to perform unskilled work.
The basic mental demands of competitive, remunerative,
unskilled work include the abilities (on a sustained
basis) to understand, carry out, and remember simple
instructions; to respond appropriately to supervision,
coworkers, and usual work situations; and to deal with
changes in a routine work setting. A substantial loss of
ability to meet any of these basic work-related
activities would severely limit the potential
occupational base. This, in turn, would justify a
finding of disability because even favorable age,

43

education, or work experience will not offset such a severely limited occupational base.

Although we are inclined to believe that the evidence from Drs. Kaczey, Parekh, and Palmer would support a finding that Plaintiff's impairments prevent him from performing, on a sustained basis, the basic mental demands of competitive work as described in SSR 85-15, we also recognize the conflicting evidence from Drs. Haslett and Mrykalo.  Inasmuch as it is not within this Court's purview to weigh the evidence, we conclude that the appropriate course to is remand this matter for further consideration and clarification of why the ALJ gave less weight to the opinions of Plaintiff's long-term treating physicians than he did to a one-time examiner and a non-examining state agency consultant.

On remand, the ALJ is directed to reconsider all the medical evidence, together with Plaintiff's subjective complaints, and clarify his findings in light of this Opinion.  Should an additional hearing be required, any question posed to a vocational expert must incorporate precisely all of Plaintiff's mental limitations supported by the medical evidence.

An appropriate order follows.

July ___26___ , 2007

William L. Standish
United States District Judge

cc:  Counsel of Record

44